DAVID J. ZUGMAN
California Bar No. 190818
964 Fifth Avenue, Suite 300
San Diego, California 92101-5008
Telephone: (619) 699-5931
Facsimile: (619) 699-5932
zugman@sbcglobal.net

Attorney for Hector Ortega-Meneses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE MARILYN L. HUFF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 08CR0444-MLH |
| Plaintiff, | ) | |
| v. | ) | |
| HECTOR ORTEGA-MENESES, | ) | MEMORANDUM OF POINTS AND AUTHORITIES |
| Defendant. | ) | |

**I.**

**INTRODUCTION**

Mr. Ortega-Meneses respectfully submits these initial Federal Rule of Criminal Procedure 12 motions. These motions are based upon the discovery received from the government thus far. Mr. Ortega-Meneses has yet to be granted access to his A-file documents though he believes that the viewing will be arranged soon. Mr. Ortega-Meneses cannot yet file his attack on the underlying removal/deportation because he has yet to receive and review the documents underlying this deportation and therefore he would only be able to file a skeletal version of the argument. Once the government has produced the relevant discovery, Mr. Ortega-Meneses will file his challenge.

**II.**

## STATEMENT OF FACTS

This is based on discovery received from the government thus far. Mr. Ortega-Meneses does not necessarily agree with this statement of facts and reserves the right to take a contrary position at trial.

Mr. Ortega-Meneses came to the government's attention during a record review searching for deported aliens.  On January 24, 2008, Immigration and Customs Enforcement Special Agents Ruiz, Willever, and Watkins, and Haynes went to 4322 Copeland Avenue, San Diego, Mr. Ortega-Meneses's family residence.  The government gained entrance to the residents by asking to look for a fictitious person.  Once inside, the government found and arrested Mr. Ortega-Meneses.

That same morning, Mr. Ortega was interrogated, given his <u>Miranda</u> rights and answered questions.  This prosecution ensued.

**III.**

## PRODUCE DISCOVERY

Mr. Ortega-Meneses has requested Rule 12, 16, and 26 by letter dated February 21, 2008 and by phone that same day.  Mr. Ortega-Meneses reiterates that request now and asks that the Government produced all constitutionally and statutorily required discovery.  The Government has produced 90 pages and a video-tape of Mr. Ortega-Meneses's statement thus far.  The Government has not produced any statements of Mr. Ortega-Meneses or any other document regarding the lack of permission element. Mr. Ortega-Meneses would ask that the Government comply with Rule 16 and provide every document that it intends on relying upon to show that Mr. Ortega-Meneses failed to return without permission to the United States.

# IV.

## THE ARREST OF MR. ORTEGA-MENESES WAS EFFECTUATED BY AN ENTRY INTO THE FAMILY HOME UNDER FALSE PRETENSES WHICH WAS UNLAWFUL AND REQUIRES SUPPRESSION OF ALL EVIDENCE DERIVED FROM THE UNLAWFUL ENTRY.

According to the statement in support of the complaint, the agents gained entry into the Ortega family home by asking Mr. Ortega's father about a fictitious person that the elder Ortega denied knowing. The agents then asked to look around the residence to find this fictitious person when in reality they were looking for Hector Ortega-Meneses. The agents found Hector Ortega-Meneses and arrested him. This arrest was unlawful and all fruit of this unlawful arrest, including Mr. Ortega-Meneses's statements, should be suppressed.

The plain language of the Fourth Amendment condemns warrantless, unreasonable searches and seizures. U.S. Const. Amend. IV; Payton v. New York, 445 U.S. 573, 585 (1980). Searches and seizures inside a home are presumptively unreasonable. Payton, 445 U.S. at 586. This is because one of the core Fourth Amendment rights is the right of a person to retreat to his home and be free from unreasonable government intrusion. Id. at 589-590. The physical entry of the home is the chief evil at which the Fourth Amendment is directed. Welsh v. Wisconsin, 466 U.S. 740, 748 (1984).

To be valid, consent must be knowing and intelligent. United States v. Phillips, 497 F.2d 1131, 1135, N.4 (9th Cir. 1974). "Before a person can be deemed to have 'knowingly' consented, he must be aware of the purpose for which the agent is seeking entry." Id. A law enforcement agent, who is known to be such by the person with whom the agent is dealing, violates the Fourth Amendment's bar against unreasonable searches and seizures when he or she gains access to a

08CR0444-MLH

1   residence by misrepresenting the purpose, nature, or scope of his or her

2   investigation.  United States v. Bosse, 898 F.2d 113, 115 (9th Cir.

3   1990).  More specifically, "[a] ruse entry when the suspect is informed

4   that the person seeking entry is a government agent but is misinformed

5   as to the purpose for which the agent seeks entry cannot be justified by

6   consent."  Id. (emphasis added).  For instance, in Phillips, this Court

7   disapproved of the entry of agents who stated their purpose was to

8   investigate a robbery, when in fact their true purpose was to arrest

9   Phillips.  497 F.2d at1135 & n. 4.

10      The policy behind this Court's case law is clear:

11          When a government agent presents himself to a private
            individual, and seeks that individual's cooperation based on
12          his status as a government agent, the individual should be
            able to rely on the agent's representations.  We think it
13          clearly improper for a government agent to gain access to
            records which would otherwise be unavailable to him by
14          invoking the private individual's trust in his government,
            only to betray that trust.
15
    Bosse, 898 F.2d at 115 (quoting SEC v. ESM Government Securities, Inc.,
16
    645 F.2d 310, 316 (5th Cir. 1981)).  In short, where government agents
17
    are known to be government agents, they cannot use a ruse to gain entry
18
    into an area to which they would otherwise not have access.
19
20      There is no explanation as to why the government had to resort to

21  a ruse: no allegation of exigency, no reason given why a warrant could

22  not be sought.  Instead, this is an simply an end-run around the warrant

23  requirement.  As in Phillips, it cannot be said that the agents entered

24  and were present in Mr. Ortega-Meneses's home for the "very purposes

25  contemplated by the occupant."  497 F.2d at 1135.  The agents did not

26  state their true purpose for seeking entry into the home, which was to

27  arrest Mr. Ortega-Meneses for an immigration violation.  The Fourth

28  Amendment was violated.

1    Evidence obtained in violation of the Fourth Amendment cannot be
2  used in criminal proceedings. <u>Weeks v. United States</u>, 232 U.S. 383, 398
3  (1914).  All tangible evidence seized after an illegal arrest is tainted
4  by that illegality and must be suppressed.  <u>United States v. Mendoza-</u>
5  <u>Ortiz</u>, 262 F.3d 882, 885 (9th Cir. 2001).

6    1.   <u>Statements Should Be Suppressed</u>

7    Statements are tainted fruit regardless of whether they are
8  voluntary. <u>Brown v. Illinois</u>, 422 U.S. 590 (1975); <u>Johnson</u>, 626 F.2d at
9  757.  Because the taint from the illegal search and detention was not
10  sufficiently attenuated, all Mr. Ortega-Meneses' statements should be
11  suppressed.  <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).  The
12  pivotal question in determining attenuation is "whether, granting
13  establishment of the primary illegality, the evidence  . . .  has been
14  come at by exploitation of that illegality or instead by means
15  sufficiently distinguishable to be purged of the primary taint." <u>Id</u>. at
16  487-88 (internal quotation marks omitted).  In order to determine
17  whether Mr. Ortega-Meneses' statement was "come at by exploitation of"
18  the illegal detention, the court must consider three factors: (1) the
19  temporal proximity of the illegal search and detention to the statement;
20  (2) the presence of any intervening circumstances; and, (3) the "purpose
21  and flagrancy" of the official misconduct. <u>Taylor v. Alabama</u>, 457 U.S.
22  687, 690 (1982); <u>Dunaway v. New York</u>, 442 U.S. 200 (1979).  The "burden
23  of showing admissibility rests, of course, on the prosecution." <u>Brown</u>,
24  422 U.S. at 591.  The prosecution did not meet its burden.

25    a.   **Mr. Ortega-Meneses' Statement Was Close in Time to the
       Illegal Detention**
26
27    According to Google maps, only a 7.3  mile drive to the Federal
Building in San Diego separated Mr. Ortega-Meneses' illegal detention
28

1  and his interrogation.   This brief interval between the illegal
2  detention and the interrogation is insufficient to purge the taint. <u>See</u>,
3  <u>e.g.</u>, <u>Brown</u>, 422 U.S. at 604 (less than two hours not sufficient to
4  purge taint); <u>Taylor</u>, 457 U.S. at 691 (six hours not sufficient); <u>United</u>
5  <u>States v. Perez-Esparza</u>, 609 F.2d 1284, 1290 (9th Cir.1979) (three hours
6  not sufficient).

7       **b.   There Were No Intervening Circumstances Between the**
        **Time of the Illegal Arrest and Mr. Ortega-Meneses'**
8       **Statement**

9       Fourth Amendment attenuation analysis focuses on the circumstances
10  that serve the twin interests of the exclusionary rule: deterrence and
11  judicial integrity. <u>See</u>, <u>e.g.</u>, <u>Brown</u>, 422 U.S. at 599-600.  This Court
12  must look not at the defendant's conduct, but rather at "intervening
13  events of significance" that "render inapplicable the deterrence and
14  judicial integrity purposes that justify excluding [a tainted]
15  statement." <u>See</u> <u>United States v. Ricardo D.</u>, 912 F.2d 337, 343 (9th
16  Cir.1990); <u>Perez-Esparza</u>, 609 F.2d at 1289.  Intervening circumstances
17  that militate in favor of attenuation must be sufficiently important to
18  ensure that potentially tainted evidence was "come at by way of" some
19  process other than the exploitation of an illegal search.  <u>Wong Sun</u>, 371
20  U.S. at 487-88.  Examples include release from custody, an appearance
21  before a magistrate, or consultation with an attorney, "such that we
22  would be able to say that [a defendant's decision to confess] was an
23  'unconstrained, independent decision' that was completely unrelated to
24  [the] initial unlawful" violation. <u>United States v. George</u>, 883 F.2d
25  1407 (9th Cir. 1989).

26       There were no such intervening events here.  After being awakened
27  in his home early in the morning and being confronted by four agents,
28  Mr. Ortega-Meneses was placed into an agent's car.  He was taken, in

continuous law enforcement presence, directly from the site of his illegal detention to the site of his interrogation. He did not speak to an attorney nor anyone other than agents. No circumstances exist that would amount to an event of the type or significance necessary to purge the taint. <u>Perez-Esparza</u>, 609 F.2d at 1289.

### c. The Agents Flagrantly Broke the Law in Arresting Mr. Ortega-Meneses in His Home Without a Warrant

The purposeful and flagrancy of the official misconduct prong suggests suppression if the law enforcement officials conducted the illegal search with the purpose of extracting the evidence in question, **or** if they flagrantly broke the law in conducting the search. <u>See</u>, <u>e.g.</u>, <u>Taylor</u>, 457 U.S. at 693 (only "purpose"); <u>Dunaway</u>, 442 U.S. at 218-19, (only "purpose"); <u>United States v. Jenkins</u>, 938 F.2d 934, 941 (9th Cir.1991) (only "flagrancy"); <u>George</u>, 883 F.2d at 1416 (only "flagrancy").

<u>Brown</u> held the taint had not been purged where the arrest, both in design and in execution, was purely investigatory. 422 U.S. at 605. The Court held that the "purpose" of the detectives was impermissible because they "embarked upon this expedition for evidence in the hope that something might turn up." <u>Brown</u>, 422 U.S. at 605; <u>see</u> <u>also</u> <u>Perez-Esparza</u>, 609 F.2d at 1289 ("When police purposely effect an illegal arrest or detention in the hope that custodial interrogation will yield incriminating statements, the deterrence rationale for application of the exclusionary rule is especially compelling.").

In <u>Taylor</u>, the police effectuated an investigatory arrest without probable cause, based on an uncorroborated informant's tip, and involuntarily transported the defendant to the station for interrogation "in the hope that something would turn up." 457 U.S. at 693. <u>Taylor</u>

1 held, "the fact that the police did not physically abuse petitioner, or
2 that the confession they obtained may have been 'voluntary' for purposes
3 of the Fifth Amendment, does not cure the illegality of the initial
4 arrest." Id.

5     Finally, New York v. Harris, 495 U.S. 14 (1990), does not foreclose
6 relief.  The Ninth Circuit held in United States v. Crawford, 372 F.3d
7 1048 (9th Cir. 2004) (en banc), that Harris limits Brown's application
8 to Payton violations, Even so, Harris did not establish a per se rule;
9 Harris did no more than establish that a Payton violation "*generally
10 does not lead to the suppression of a post-arrest confession.*" Powell
11 v. Nevada, 511 U.S. 79, 85 n.* (1994) (emphasis added).  See also
12 Anderson v. Calderon, 232 F.3d 1053, 1071 (9th Cir. 2000), overruled on
13 other grounds, Bittaker v. Woodford, 331 F.3d 715, 728 (9th Cir. 2003)
14 (en banc) (describing Powell as "fram[ing] the holding in Harris").
15 Thus, Harris sets forth a general, not universally applicable, rule.

16     Here, given that the agents willfully evaded the warrant
17 requirement and effected entry by lying to Mr. Ortega-Meneses father so
18 that the agents could arrest Mr. Ortega-Meneses in the pre-dawn hours is
19 egregious conduct which merits suppression.

20     2.  Physical Evidence That Would Tend to Establish Mr. Ortega-
21        Meneses' Identity Should Have Been Suppressed

22     The body or identity of a criminal defendant is not itself
23 suppressible.  See INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984).
Thus, even if an unlawful arrest occurs, a defendant may be lawfully
24 compelled to appear in court.  United States v. Garcia-Beltran, 389 F.3d
25 864, 866 (9th Cir. 2004).  However, evidence unlawfully obtained from a
26 suspect must still be suppressed if that evidence was obtained for
27 investigatory purposes; for example, to link an individual arrested near
28

08CR0444-MLH

1    the border to a criminal immigration law violation.  Id. at 868.

2        In United States v. Guevera-Martinez, 262 F.3d 751 (8th Cir. 2001),

3    the Eighth Circuit held that the defendant's fingerprints, obtained by

4    exploiting the defendant's detention following an illegal traffic stop

5    and arrest, must be suppressed in a subsequent prosecution for being an

6    illegal alien in the United States.  In so ruling, the court

7    distinguished between jurisdictional challenges to identity evidence,

8    see Lopez-Mendoza, 468 U.S. at 1039 (body or identity of defendant not

9    suppressible in civil deportation proceeding), and evidentiary

10   challenges to fingerprint evidence in criminal cases.  Davis v.

11   Mississippi, 394 U.S. 721 (1969) (fingerprint evidence suppressed in

12   criminal case); Hayes v. Florida, 470 U.S. 811 (1985) (same).  In both

13   Davis, and Hayes, the Supreme Court held that fingerprints obtained as

14   a result of constitutional violations and used for investigatory

15   purposes must be suppressed in the criminal case flowing from that

16   investigation.  This Court should suppress any evidence gained from the

17   fingerprinting of Mr. Ortega-Meneses as that was a direct fruit of the

18   unlawful arrest.

19                                    **V.**

20           **THE INDICTMENT FAILS TO PROPERLY ALLEGE AN OFFENSE**

21       On February 14, 2008, the government obtained a one count

22   indictment alleging the following:

23           On or about January 24, 2008, within the Southern
             District of California, defendant HECTOR ORTEGA-MENSES an
24           alien, who previously had been excluded, deported and removed
             from the United States to Mexico, was found in the United
25           States, without the Attorney General of the United States or
             his designated successor, the Secretary of the Department of
26           Homeland Security (Title 6, United States Code, Sections
             202(3) and (4) and 557), having expressly consented to the
27           defendant's reapplication for admission into the United
             States; in violation of Title 8, United States Code, Section
28           1326(a) and (b)

1        It is further alleged that defendant HECTOR ORTEGA-MENSES

2 was removed from the United States subsequent to March 23, 2005.

3 As written, the indictment fails to establish probable cause to believe

4 that an offense was committed against the U.S.. This indictment allows

5 the Grand Jury to find probable cause for this offense if it found that

6 either the Attorney General or the Secretary of the Department of

7 Homeland Security did not consent to Mr. Ortega-Meneses's reapplication

8 to admission to the United States. Since the creation of the Department

9 of Homeland Security, however, it is now clear that Section 1326

10 requires that United States prove that the Secretary of the Department

11 of Homeland Security did not consent. See 6 U.S.C. § 557.[1] Section 557

12 went into effect on January 24, 2003. Since the indictment against Mr.

13 Ortega-Meneses alleges a removal after March 23, 2005, the Attorney

14 General has no role in deciding whether Mr. Ortega-Meneses has

15 permission to enter or reside in the United States. As written, the

16 grand jury could have found that Attorney General did not consent to Mr.

17 Ortega-Meneses's reentry, but that would not create a valid charge of

18 illegal entry after deportation under Section 1326.

19 A disjunctive indictment is insufficient unless both possibilities

20 allow for a finding of probable cause. "[I]t is fatal for an indictment

21 or information to charge disjunctively in the words of the statute, if

22 the disjunctive renders it uncertain as to which alternative is

23

24    [1]   "With respect to any function transferred by or under this

25 Act (including under a reorganization plan that becomes effective under section 1502 [6 USCS § 542]) and exercised on or after the

26 effective date of this Act, reference in any other Federal law to any department, commission, or agency or any officer or office the

27 functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which

28 such function is so transferred."

1 intended." 2 <u>Wharton's Criminal Procedure</u> § 291 (12th ed. 1975).[2] "If
2 the indictment or information alleges the several acts in the
3 disjunctive it fails to inform the defendant which of the acts he is
4 charged with having committed, and it is insufficient." 1 C. Wright,
5 <u>Federal Practice and Procedure</u>: Criminal 2d §  , § 125 at 373-74.
6 Binding precedent supports this interpretation:

> Once it is determined that the statute defines but a single
> offense, it becomes proper to charge the different means,
> denounced disjunctively in the statute, conjunctively in each
> count of the indictment." <u>United States v. UCO Oil Co.</u> 546
> F.2d 833, 838 (9th Cir. 1976) (citing <u>United States v. Alsop</u>,
> 479 F.2d 65, 66 (9th Cir. 1973)), cert. denied, 430 U.S. 966,
> 97 S. Ct. 1646, 52 L. Ed. 2d 357 (1977).

11 If all powers have been transferred to the Secretary of the Department
12 of Homeland Security, then the Attorney General's failure to consent is
13 irrelevant.  This indictment allows for a grand jury to find probable
14 cause based on legally insufficient information.  It should be
15 dismissed.  Further, Mr. Ortega-Meneses asks for disclosure of the grand
16 jury transcripts pursuant to Federal Rule of Criminal Procedure 6(e)(ii)
17 to avoid a variance at trial between what was shown to the grand jury
18 regarding the lack of consent and the evidence admitted at trial.

19 **VI.**

20 **THE GRAND JURY MISINSTRUCTION**

21 **A.   Introduction**

22 This argument evolves from the original grand jury misinstruction

---

24 [2]     The Supreme Court has frequently relied upon the authors of
25 the Model Penal Code on various issues. <u>See</u>, e.g., <u>Liparota v. United
   States</u>, 471 U.S. 419, 423 n.5 (1985). In addition, Congress is
26 presumptively familiar with scholarly writing in mens rea issues. <u>See</u>
   <u>Holloway v. United States</u>, 526 U.S. 1, 9 (1999) (observing that "it is
27 reasonable to presume that Congress is familiar with the scholarly
   writing" on conditional intent issue and citing authors of the Model
28 Penal Code and Professor LaFave).

1  argument that was first considered in <u>United States v. Marcucci</u>, 299

2  F.3d 1156, 1158 (9th Cir. 2002), and his since enjoyed several

3  iterations.  The current point of dispute regards the dismissal of grand

4  jurors who might not be inclined to indictment or who might consider

5  punishment and the misinformation regarding the prosecutor's duty

6  regarding exculpatory evidence.  Mr. Ortega-Meneses believes that those

7  dismissals violated the grand jury guarantee.

8       **B.   Proceedings before the Grand Jury**

9       The transcripts of the grand jury instructions has now been

10  revealed and discussed in several cases.  Mr. Ortega-Meneses assumes

11  that the transcripts are accurate and provide the basis for this motion.

12  Mr. Ortega-Meneses can file a copy of the transcripts with the Court

13  should it so desire.[3]  First, the instructions forbid grand jurors from

14  declining to authorize a prosecution for which there is probable cause

15  because they do not agree with it.  Second, the instructions advised the

16  grand jurors that the prosecutor is obliged to present to them evidence

17  that "cuts against what they may be asking [the grand jurors] to do if

18  they are aware of that evidence."[4]

19       These instructions are explicitly based on the idea that the grand

20  jury function is solely to assess probable cause.

21       [T]he grand jury is determining really two factors: "do we
        have a reasonable belief that a crime was committed?  And
22

23       [3]  These instructions were adduced in <u>United States v. Martinez-</u>

24  <u>Covarrubias</u>, 07CR0491-BTM.  Mr. Ortega-Meneses believes the Court is
    already familiar with and in possession of those transcripts.

25
        [4]  The transcript of the voir dire indicates that grand jurors

26  were shown a video presentation on the role of the grand jury.  Mr.
    Ortega-Meneses requests that the video presentation be produced.  <u>See</u>

27  <u>United States v. Alter</u>, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973)
    ("[t]he proceedings before the grand jury are secret, but the ground

28  rules by which the grand jury conducts those proceedings are not.").

1    second, do we have a reasonable belief that the person that
     they propose that we indict committed the crime?"

2        If the answer is "yes" to both of those, then the case
     should move forward.  If the answer to either of the questions

3    is "no," then the grand jury should not hesitate and not
     indict.

4

5    The use of "should" here cannot be read to be anything other than

6    mandatory: "should" cannot reasonably be read to mean optional when it

7    addresses the obligation not to indict when the grand jury has no

8    "reasonable belief that a crime was committed" or if it has no

9    "reasonable belief that the person that they propose that we indict

     committed the crime."
10

11       This view must have been reinforced by the questioning of two

12   potential grand jurors who indicated that, in some unknown set of

13   circumstances, they might decline to indict even where there was

14   probable cause.  One thought drugs should legal and the other was not

15   fond of immigration cases.  The instructions clearly told them to ignore

     that part of their conscious
16

17       Now, the question is can you fairly evaluate [drug cases and
         immigration cases]?  Just as the defendant is ultimately

18       entitled to a fair trial and the person that's accused is
         entitled to a fair appraisal of the evidence of the case

19       that's in front of you, so, too, is the United States entitled
         to a fair judgment.  If there's probable cause, then the case

20       should go forward.  *I wouldn't want you to say*, "well, yeah,
         there's probable cause, but I still don't like what our

21       government is doing.  I disagree with these laws, so I'm not
         going to vote for it to go forward."  If that is your frame of

22       mind, the probably you shouldn't serve.  Only you can tell me
         that.

23   This lays bare the cordoning of the grand jury function because it told

24   the grand jurors that considerations like that the grand juror "[didn't]

25   like what our government is doing," but in which there was probable

26   cause such a case "should go forward."  This clearly tells grand jurors

27   not to use their discretion.

28       This was plain in the instance of the grand juror who asked about

1  medical marijuana and the disparate state versus federal treatment of
2  the issue.

3          Well, those things -- the consequences of your determination
           shouldn't concern you in the sense that penalties or
4          punishment, things like that -- we tell trial jurors, of
           course, that they cannot consider the punishment or the
5          consequence that Congress has set for these things. We'd ask
           you to also abide by that. We want you to make a business-
6          like decision of whether there was a probable cause. ...

7  Again, this makes it clear that "should" meant "must."

8          This line of thought was further explored when the belief was
9  expressed by a grand juror "that drugs should be legal." Kicking around
10 this idea led to following instruction which said that (in a refrain
11 popular with Justice Scalia in his discussions of abortion rights) that
12 the remedy to bad laws is democracy and the legislative process.

13          I can tell you sometimes I don't agree with some of the
           legal decisions that are indicated that I have to make. But
14         my alternative is to vote for someone different, vote for
           someone that supports the policies I support and get the law
15         changed. It's not for me to say, "well, I don't like it. So
           I'm not going to follow it here."
16         You'd have a similar obligation as a grand juror even
           though you might have to grit your teeth on some cases.
17         Philosophically, if you were a member of congress, you'd vote
           against, for example, criminalizing marijuana. I don't know
18         if that's it, but you'd vote against criminalizing some drugs.

19          That's not what your prerogative is here. You're
           prerogative instead is to act like a judge and say, "all
20         right. This is what I've to deal with objectively. Does it
           seem to me that a crime was committed? Yes. Does it seem to
21         me that this person's involved? It does." *And then your
           obligation, if you find those to be true, would be to vote in
22         favor of the case going forward.*

23 Thus, the grand juror's duty is to conduct a simple two part test,
24 which, if both questions are answered in the affirmative, lead to an
25 "obligation" to indict.

26         Under this paradigm, grand jurors were then questioned about their
27 potential to deviate from the "probable-cause" only test.

28         The Court: do you think you'd be inclined to let people go in

1   drug cases even though you were convinced there was probable
    cause they committed a drug offense?
2   REA: It would depend on the case.
    The Court: Is there a chance that you would do that?
3   REA: Yes.
    The Court: I appreciate your answers.  I'll excuse you at this
4   time.

5   Here, the Grand Juror is excused because there was a question about

6   whether something other than probable cause would prevent the juror from

7   indicting.

8       This error is aggravated by the overstatement of the prosecutorial

9   duty to disclose to the grand jury.

10      Now, again, this emphasizes the difference between the
        function of the grand jury and the trial jury.  You're all
11      about probable cause.  If you think that there's evidence out
        there that might cause you to say "well, I don't think
12      probable cause exists," then it's incumbent upon you to hear
        that evidence as well.  As I told you, in most instances, the
13      U.S. Attorneys are duty-bound to present evidence that cuts
        against what they may be asking you to do if they're aware of
14      that evidence.

15  The antecedent to this instruction is also found in the impanelment.

16  After advising the grand jurors that "the presentation of evidence to

17  the grand jury is necessarily one-sided," that truth is undone somewhat

18  by the statement that "[his] experience is that the prosecutors don't

19  play hide-the-ball.  If there's something adverse or that cuts against

20  the charge, you'll be informed of that.  They have a duty to do that."

21  This is not a guarantee that could be enforced and thus it is unfair and

22  untrue to inform the grand jurors that exculpatory evidence would be

23  presented if it existed.

24      **C.  Argument**

25      Mr. Ortega-Meneses believes that the above instruction of the grand

26  jury was historically unfaithful to its role.  As always, the context in

27  which the right arose is an excellent starting point to decide what the

28  right is supposed to be.  One of the seminal cases for the grand jury

1  right involved precisely the kind of refusal to indict where probable

2  cause existed.  John Peter Zenger's case was twice presented to a grand

3  jury for indictment on libel and sedition charges, but the grand jury

4  would not authorize the charges.  This required the governor to resort

5  to filing an information that Alexander Hamilton ridiculed at trial?[5]

6  Would the colonists have been as strongly supportive of the grand jury

7  right?  Would the Framers have included it in the Fifth Amendment?

8       We are no longer in the Navarro-Vargas majority's view which found

9  that grand jurors could understand "should" as could rather than must.

10 With the foregoing instructions to the January 2007 grand jury, that

11 indulgence can no longer be had.  Simply put, Navarro-Vargas's analysis

12 entirely depends on that should/must distinction and it does not dispute

13 that grand jurors do have the right to decline to indict.  Navarro-

14 Vargas supports the conclusion that these instructions run afoul of the

15 Fifth Amendment.

16      In Navarro-Vargas, the Ninth Circuit narrowly upheld the unmodified

17 model grand jury instructions given to the grand jury in that case, but

18 not without "conced[ing] that there may be more done to further increase

19 the shielding power of the modern federal grand jury," and explicitly

20 "not [ ] hold[ing] that the current instructions could not or should not

21 be improved." See Navarro-Vargas, 408 F.3d at 1208.  Taken together, the

22 voir dire of and instructions given to the January 2007 Grand Jury, go

23 far beyond those at issue in Navarro-Vargas, taking a giant leap in the

24 direction of a bureaucratic, deferential grand jury, focused solely upon

25 probable cause determinations and utterly unable to exercise any quasi-

26 prosecutorial discretion.  That is not the institution the Framers

27

28      [5]  See generally William R. Glendon, The Trial of John Peter
    Zenger, 68-DEC N.Y. St. B.J. 48, 50-51 (1996).

1  envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

2  Everyone, including Mr. Ortega-Meneses, concedes that the grand

3  jurors are not allowed to make up their own law; they do not sit in

4  judgment of the legislators choice in deciding what conduct is

5  prohibited.  They do, however, stand in judgment as to each individual

6  case in deciding whether a prosecution should be had or whether the

7  matter being presented is a case of Government overreaching, too harsh

8  a charge, or is otherwise unfit for prosecution.  Indeed, that is a

9  fundamental part of their constitutional discretion to not indict even

10  if probable cause supports the charge. See Navarro-Vargas, 408 F.3d at

11  1200 (citing Vasquez v. Hillery, 474 U.S. 254, 263 (1986)).

12  The legitimacy of the discretion vested in grand jurors is made

13  clear in *Vasquez*.  That case ultimately held that racial discrimination

14  in grand jury selection is, in effect, a structural error.  One of the

15  reasons why racial discrimination in grand jury selection is so

16  prejudicial – even after a petit jury conviction – is that the grand

17  jury enjoys broad discretion in choosing what to charge and whether to

18  charge at all, even in a case where there is not only probable cause,

19  but proof beyond a reasonable doubt.  See Vasquez, 474 U.S. at 263.  If

20  a grand jury's discretion not to charge an offense, or to charge a

21  lesser offense, was not a *legitimate* grand jury function, then *Vasquez*

22  could not have relied upon that attribute in determining whether the

23  error in that case merited reversal.

24  There is no doubt that the January 2007 Grand Jury was so

25  instructed that probable cause was the beginning and the end of the

26  inquiry for whether to indict.

27          Court    . . . If there's probable cause, then the
                 case should go forward.  I wouldn't want you to
28               say, "Well, yeah, there's probable cause.  But I

1    still don't like what the government is doing.  I
     disagree with these laws, so I'm not going to vote
2    for it to go forward."  If that's your frame of
     mind, then probably you shouldn't serve.  Only you
3    can tell me that.

4    Prospective Juror: Well, I think I may fall in that
     category.
5
     The Court: In the latter category?
6
     Prospective Juror: Yes.
7
     The Court: Where it would be difficult for you to
8    support a charge even if you thought the evidence
     warranted it?
9
     Prospective Juror: Yes.
10
     The Court: I'm going to excuse you then.
11
That cannot be spun to be anything other than it is: a juror being
12
excused for indicating that should could be understood as "possibly"
13
rather than must.  This point is clear from the case "should go forward"
14
language and the disapproval of any dissent from that. ("I wouldn't want
15
you [to vote against such a case]").  The sanction for the possibility
16
of independent judgment was dismissal, a result that provided full
17
deterrence of that juror's discretion and secondary deterrence as to the
18
exercise of discretion by any other prospective grand juror.
19
     Though one uncured, corrosive instruction should be sufficient to
20
taint the grand jurors, in this case the process was catalyzed.
21
     Court      . . . It's not for me to say, "Well, I
22   don't like it.  So I'm not going to follow it
     here."
23
          You'd have a similar *obligation* as a grand
24   juror even though you might have to grit your teeth
     on some cases.  Philosophically, if you were a
25   member of Congress, you'd vote against, for
     example, criminalizing marijuana.  I don't know if
26   that's it, but you'd vote against criminalizing
     some drugs.
27
          That's not what your *prerogative* is here.
28   Your prerogative instead is act like a judge and to

1    say, "All right.  This is what I've got to deal
     with objectively.  Does it seem to me that a crime
2    was committed?  Yes.  Does it seem to me that this
     person's involved?  It does."  *And then your*
3    *obligation, if you find those things to be true,*
     *would be to vote in favor of the case going*
4    *forward.*

5  After telling this potential juror (REA) what his obligations and

6  prerogatives were, the Court inquired as to whether "you'd be inclined

7  to let people go on drug cases even though you were convinced there was

8  probable cause they committed a drug offense?"  The potential juror

9  responded: "It would depend on the case."  Nevertheless, that juror was

10  excused.  Again, in this context, and contrary to the situation in

11  Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror

12  has no prerogative to do anything other than indict if there is probable

13  cause.

14     Moreover, as this example demonstrates, the issue is not limited to

15  whether the grand jury believes a particular law to be "unwise."  This

16  juror said that any decision to indict would not depend on the law, but

17  rather it would "depend on the case."  Thus, the rule of "must" rather

18  than should is being applied for *every* case, rather than being case

19  specific.  It is equally clear that the prospective juror did not

20  dispute the "wisdom of the law;" he was prepared to indict under some

21  factual scenarios, perhaps many.  It was only the discretion that led to

22  his dismissal.

23     Consider also the following: "[W]hat I have to insist on is that

24  you follow the law that's given to us by the United States Congress.  We

25  enforce the federal laws here."  And then again, after swearing in all

26  the grand jurors who had already agreed to indict in every case where

27  there was probable cause, the point was reiterated that "should" means

28  "shall" when the grand jurors were reminded that "your option is not to

1  say 'well, I'm going to vote against indicting even though I think that

2  the evidence is sufficient . . . . Instead your *obligation* is . . . not

3  to bring your personal definition of what the law ought to be and try to

4  impose that through applying it in a grand jury setting."

5      Plainly, the penalty question was removed from the grand jury:

6      Prospective Juror (REA): ... And as far as being fair, it kind
       of depends on what the case is about because there is a
7      disparity between state and federal law.

8      The Court:  In what regard?

9      Prospective Juror: Specifically, medical marijuana.

10     The Court:  Well, those things -- the consequences of your
       determination shouldn't concern you in the sense that
11     penalties or punishment, things like that -- *we tell trial
       jurors, of course, that they cannot consider the punishment or*
12     *the consequence that Congress has set for these things.  We'd
       ask you to also abide by that.*  We want you to make a
13     business-like decision of whether there was a probable cause.
       ...

14  A "business-like decision of whether there was a probable cause" would

15  obviously leave no role for the consideration of penalty information.

16     The dismissal of these two grand jurors and its affect on the other

17  grand jurors made one clear message: indict in every case where there is

18  probable cause or you will be excused as being unfit for this service.

19  The remaining grand jurors could not have understood the actions any

20  other way.  Consequently, to the extent that the Court in <u>Navarro-Vargas</u>

21  took solace in the fact that the structure of the grand jury with its

22  secrecy and unreviewability allows grand juries to continue exercising

23  their full prerogatives, 408 F.3d at 1200, *this* particular grand jury

24  could not have felt so emboldened.

25     Finally, the duty to present exculpatory evidence is just not true.

26  Even if true, the statement that "you can expect that the U.S. Attorneys

27  that will appear in front of you will be candid, they'll be honest, that

28

1  they'll act in good faith in all matters presented to you." That might
2  well state the *probable* case, but if it is given in every case it will
3  certainly prove not to be true sometimes. These vouching-type
4  instructions, coupled with the creation of a misleading suggestion that
5  "in most instances" prosecutors were "duty-bound" to present anything
6  that is "adverse or cuts against the charge," informs grand jurors that
7  it is likely that there is no evidence that qualifies as "adverse or
8  cuts against the charge."

9      As an investigative body, it is the grand jury's responsibility to
10 find the facts. See <u>United States v. Sells Engineering</u>, 463 U.S. 418,
11 423 (1983) (the grand jury "has always been extended extraordinary power
12 of investigation and great responsibility for directing its own efforts
13 . . . ."). Here, the instructions are telling them not to exploit that
14 power because of the "candid," "honest," "duty-bound" prosecutor would
15 have presented such evidence if an investigation could have turned it
16 up. Thus, there is no need to investigate, and certainly no need to act
17 as a vigorous check on charging decisions made by "candid," "honest,"
18 "duty-bound" public servants. The end result, then, is that grand
19 jurors should consider evidence that goes against probable cause, but,
20 if none is presented by the government, they can  presume that there is
21 none, or if some is presented, it represents the universe of all
22 available exculpatory evidence. This simply is not the case, and the
23 grand jury's independence and investigatory powers are
24 unconstitutionally impinged upon by these instructions. These
25 instructions are not supported by the Constitution, caselaw, or even the
26 U.S. Attorneys' own code of conduct, and they devastate any notion of
27 the grand jury's protective powers.

28      We know that the statement is not a correct recitation of law.

1  United States v. Williams, 504 U.S. 36, 49 (1992).  It is also not

2  really a correct recitation of the facts either.  The instruction that

3  prosecutors would present anything "adverse or that cuts against the

4  charge" can also be fairly understood to include any evidence that

5  undercuts guilt, impeachment information concerning the sources of

6  information presented to the grand jury that might cast doubt upon the

7  information's accuracy, any evidence that would undercut an element of

8  the charge, or any evidence of an affirmative defense.  Not even the

9  United States Attorney Manual -- that unenforceable body of rules and

10  rights -- requires such an outcome.  Section 9-11.223 states that the

11  prosecutor must disclose evidence that "directly negates the guilt of a

12  subject of the investigation."  Thus, even evidence that has a

13  reasonable probability of undercutting guilt if effectively used by the

14  defense, evidence that meets the constitutional standard of materiality

15  for purposes of trial, see United States v. Bagley, 475 U.S. 667, 676

16  (1985), might not even rise to the "directly negates" standard governing

17  disclosure to grand juries.  As for the other types of evidence listed

18  above, § 9-5.001 demonstrates that under the government's definitions,

19  such exculpatory information is not even considered to be material to a

20  finding of guilt, much less "directly negat[ing]" a finding of guilt.

21      Section 9-5.001 defines two different sorts of exculpatory and

22  impeachment evidence:  that which the government believes is

23  constitutionally or legally required and that which is exculpatory or

24  impeaching beyond that which is constitutionally and legally required.

25  See id. at 9-5.001(B).  Section 9-5.001 defines exculpatory and

26  impeachment evidence that the government defines as being beyond the

27  scope of what is "constitutionally and legally required."  According to

28  the USAM, such information is "relevant exculpatory or impeachment

1  information that is significantly probative of the issues before the
2  court but that may not, on its own, result in an acquittal or, as is
3  often colloquially expressed, make the difference between guilt and
4  innocence."  USAM § 9-5.001.  In other words, such evidence is that
5  which does not "directly negate[]" guilt.  Compare USAM § 9-11.223.

6      This evidence and information which the prosecutor is duty-bound to
7  present for purposes of trial and other court proceedings, but not to
8  the grand jury who was instructed that it would be presented with
9  anything "adverse or that cuts against the charge" includes:

10     --evidence that "is inconsistent with any element of any crime
11  charged against the defendant,"

12     --evidence that "establishes a recognized affirmative defense," and

13     --evidence in the form of impeachment information that "either
    casts a substantial doubt upon the accuracy of any evidence--including
14  but not limited to witness testimony--the prosecutor intends to rely on
    to prove an element of any crime charged."

15  USAM § 9-5.00(C)(1), (2).

16     As noted above, § 9-5.001, by its own explicit terms, does not
17  apply to the prosecutor's separate, limited duty to disclose exculpatory
18  information to the grand jury.  However, it does shed light on what the
19  government considers to be evidence that "directly negates" guilt, and
20  such limited evidence falls unjustifiably short of what the grand jurors
21  were instructed that they would receive.

22     Further, whatever guidance a prosecutor gets from the U.S. Attorney
23  Manual is just guidance because it does not create rights or remedies.
24  In short, a grand jury misled into believing that the failure to present
25  evidence that is "adverse" or that "cuts against" probable cause, will
26  assume that there is no such evidence, leading it to inaccurate probable
27  cause determinations and stunting its development of the independent
28  investigations anticipated by the Framers.  See Sells Engineering, 463

1  U.S. at 423 (emphasizing the grand jury's power of independent
2  investigation).

3  **D.  Prejudice**

4      Mr. Ortega-Meneses, society, and the Constitution are entitled to
5  the "traditional functioning of the institution that the Fifth Amendment
6  demands," *see* Williams, 504 U.S. at 51.  The grand jury must be given
7  the powers that our Framers instilled in it and the Supreme Court
8  explicated in Vasquez.  This error strikes at the structure of our
9  government.  See Navarros-Vargas, 408 F.3d at 1214, 1216-17 (Hawkins,
10 J., dissenting).  Accord Navarros-Vargas, 367 F.3d at 903 (Kozinski, J.,
11 dissenting).  It is impossible to know how a properly instructed grand
12 jury -- one that did not believe that its sole function was probable
13 cause determination -- would evaluate "the need to indict" in a
14 particular case, see Vasquez, 474 U.S. at 264, there are benefits to
15 encouraging the grand jury to actually exercise its meaningful
16 discretion to investigate which may lead it to uncover still more facts
17 that may affect its assessment of the case.  See Sells Engineering, 463
18 U.S. at 423 (the grand jury "has always been extended extraordinary
19 power of investigation and great responsibility for directing its own
20 efforts . . . .").  No one can say what investigations may be prompted,
21 nor can anyone know what facts would be developed.  "Harmless-error
22 analysis in such a context would be a speculative inquiry into what
23 might have occurred in an alternate universe."  See United States v.
24 Gonzalez-Lopez, 126 S. Ct. 2557, 2565 (2006).

25     The grand jury's ability to apply its community perspective to the
26 facts, and its potential to bring new facts to light by way of its self-
27 directed investigations, "bear[] directly on the 'framework within which
28 the [grand jury's screening function] proceeds.'"  Gonzalez-Lopez, 126

1  S. Ct. at 2564-65 (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310

2  (1991)).  The end result is similar to that in <u>Gonzalez-Lopez</u>.  There,

3  in analyzing the deprivation of the defendant's right to choice of

4  counsel, the Supreme Court observed that "[i]t is impossible to know

5  what different choices the rejected counsel would have made, and then to

6  quantify the impact of those different choices on the outcome of the

7  proceedings."  <u>Id.</u> at 2565.  Here, we cannot know "what different

8  choices [the grand jury] would have made" with respect to its screening

9  or investigative functions had it been asked to exercise its full

10  discretion, nor can "the impact of those different choices" be

11  "quantif[ied]."  <u>See id.</u>  In short, facts provide context, context

12  informs discretion, and discretion affects results in ways that cannot

13  be predicted.  The error is structural.

**VII.**

**FILE FURTHER MOTIONS**

16      Mr. Ortega-Meneses also requests that he be allowed to file further

17  motions as new discovery demonstrates their necessity.  Mr. Ortega-

18  Meneses is not filing his collateral attack on the deportation yet as he

19  has not had access to his A-file which is a prerequisite to filing the

20  motion.

**VIII.**

**CONCLUSION**

23      Mr. Ortega-Meneses requests that the Court grant these motions and

24  dismiss the case.

                              Respectfully submitted,


Dated: March 16, 2008         S/ David Zugman
                              David J. Zugman
                              Attorney for Mr. Ortega-Meneses